# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CERNATA MORSE, <br><br> Plaintiff, <br><br> v. <br><br> JAMES N. MATTIS, <br><br> Defendant. | Civil Case No. 17-1881 |

## MEMORANDUM OPINION

Cernata Morse, a former Equal Employment Specialist at the Defense Intelligence Agency, sues the government under Title VII of the 1964 Civil Rights Act claiming her supervisors treated her differently because she was a fair-skinned African American woman. She also sues under the Rehabilitation Act claiming the Agency fired her because her disability necessitated time-off under the Family and Medical Leave Act. But she fails to disprove the government's asserted nondiscriminatory reason for firing her. So the Court will grant summary judgment for the government.

I

The Defense Department tasks the Defense Intelligence Agency with producing, analyzing, and disseminating military intelligence information. To accomplish this mission, the Agency employs roughly 16,500 employees divided among several different sections, including one—the Equal Opportunity Office—devoted to federal civil rights law compliance and education. In October 2007, Morse joined that office as a program manager responsible for planning and coordinating activities and celebrations commemorating significant civil rights

occasions. Gov't's Ex. 1 at 5:6-19; Gov't's Ex. 2 at 15:15–16:19; Gov't's Ex. 3 at 404. The Agency hired Morse through an excepted service appointment: she would serve on a probationary basis for two years before the Agency decided whether to permanently hire her. Pl.'s Ex. 16 at 75:5-7; Gov't's Ex. 3 at 1015. When those two years began, Morse reported directly to her division chief, Noemi Pizarro Hyman, in addition to the office's deputy chief, Constance Morrow, and its chief, Nancy Scott. Pl.'s Ex. 2 at 5:20–6:4; Gov't's Ex. 2 at 329:4-10; 378:2-11. Morse suffered from degenerative arthritis in her hip throughout her term at the Agency, giving her a noticeable limp and requiring her to use a special chair and handicapped parking. Pl.'s Ex. 2 at 7:11–8:17, 13:13–14:3; Pl.'s Ex. 16 at 74:7–76:4.

A month later, the Office also hired Monshi Ramdass as a program manager under Pizzaro Hyman. Gov't's Ex. 2 at 224:16–225:9. And two months after that, the Agency reassigned Pizarro Hyman outside the Equal Opportunity Office. Gov't's Ex. 1 at 542:7-17. She intended to prepare final performance ratings for her employees before she left, but problems with the human resources software prevented her from evaluating Morse and Ramdass. Pl.'s Ex. 2 at 16:18–17:20; Pl.'s Ex. 3 at 334:14–336:17; Gov't's Ex. 2 at 360:2–361:10. Morse contends Morrow and Scott, both Caucasian women, intentionally caused these software issues to prevent Pizarro Hyman, a biracial woman, from evaluating Morse, an African American woman, and Ramdass, a South American man. Pl.'s Ex. 2 at 17:9-12; Pl.'s Ex. 3 at 351:11-18; Gov't's Ex. 1 at 329:14-22; Gov't's Ex. 2 at 223:20-224:3, 379:3-8.

After Pizarro Hyman left, Morrow temporarily assumed the division chief responsibilities. Gov't's Ex. 1 at 542:7-17. So Morrow conducted Morse and Ramdass's performance evaluations. Pl.'s Ex. 3 at 336:18–337:1. Out of thirty possible points, she gave Morse seventeen and Ramdass twenty-three, both within the review form's "Meets

2

Expectations" range. *See* Pl.'s Ex. 5. (In a deposition, Pizarro Hyman guessed she would have given Morse eighteen or nineteen points. Pl.'s Ex. 3 at 342:2-13; Pl.'s Ex. 5.) Morse "complained" to Morrow about this rating, *see* Pl.'s Statement Material Facts ¶ 16, ECF No. 34-2, even though Morrow described it as "really a good rating" Morse—"who had just started out in the Agency"—"should feel good about." Pl.'s Ex. 2 at 29:12-21.

A few weeks later, Morse caught wind of plans to reassign her as an assistant to Mika Cross, a caucasian woman thirteen years her junior, even though Morse and Cross currently operated at the same level—Morse planned special events, and Cross marketed them. Pl.'s Ex. 2 at 49:13–52:20; Gov't's Ex. 2 at 30:5–31:14. Scott admits she considered reassigning Morse, but claims it was only to better leverage Morse's prior marketing experience and insists there would not have been a supervisory relationship between Morse and Cross. Gov't's Ex. 1 at 295:19–297:8, 584:15–587:17; Gov't's Ex. 2 at 392:2-9. In any event, Scott squelched those plans after meeting with Morse, who also met with the Agency's general counsel. Pl.'s Ex. 2 at 49:13–52:20; Gov't's Ex. 2 at 31:11-17, 34:2-12, 132:10–133:2.

Around the same time, the Agency began reviewing candidates to replace Pizzaro Hyman. Pl.'s Ex. 2 at 42:17–43:5; Gov't's Ex. 2 at 229-30. Ramdass applied but did not get an interview, even though Morse alleges Morrow shared confidential information about the hiring process with him to improve his chances. Pl.'s Ex. 2 at 43:14-22, 46:16–47:7, 48:4-7; Gov't's Ex. 2 at 229:11–230:9; Gov't's Ex. 3 at 16. The Agency ultimately hired Scott Lanum, an African American male a few years younger than Morse. Pl.'s Ex. 2 at 442.

Days after Lanum started, Morse asked to change her schedule to a flexible start time, a request usually granted as a matter of course. Pl.'s Ex. 2 at 57:15–61:21; Pl.'s Ex. 7 at 163:9-14; Pl.'s Ex. 8 at 268:2-8. But since Lanum was still acclimating to his new role and to his

employees, he asked Morse for some time to consider the modification. Pl.'s Ex. 6 at 23:16–25:15. And almost immediately he noticed Morse "continuous[ly]" and "regular[ly]" arriving late to morning meetings and other obligations. *Id.* When he asked his deputy "what the heck [wa]s going on," she responded, "This is Cernata. . . . we know she comes to work late. We don't know why. She's never said." *Id.* When Lanum asked Morse directly, Morse apologized and admitted "[s]he doesn't know why she can't get to work on time," but shared she was having "some challenges at home." *Id.* Shortly thereafter, hoping to help accommodate those challenges, Lanum approved Morse's flexible start time. Pl.'s Ex. 2 at 60:19–61:17; Pl.'s Ex. 6 at 28:20–31:20.

In addition to Morse's chronic tardiness, she faced escalating interpersonal difficulties with her colleagues and superiors. When Morse and Cross clashed over sharing information related to Morse's events, Lanum facilitated a mediation to develop a better information-sharing protocol. Pl.'s Ex. 2 at 71:8–75:18; Pl.'s Ex. 6 at 55:15–56:17; Gov't's Ex. 1 at 300:13–309:13, 472:10–473:17; Gov't's Ex. 2 at 46:12–14; Gov't's Ex. 3 at 419. Lanum also met with Morse and Ramdass after Morse failed to submit a weekly report she owed him. Ramdass first called Morse about it, but Morse hung-up on him, causing him to "lose his cool." Pl.'s Ex. 2 at 105:2–108:9; Gov't's Ex. 1 at 246:9–251:12, 482, 494:20–497:22; Gov't's Ex. 2 at 458:13–460:21; Gov't's Ex. 3 at 421. A month later, Morse again tangled with Ramdass, Scott, and Morrow when they characterized Morse's job as "just plan[ning] parties." Pl.'s Ex. 2 at 109:11–110:16; *see also* Pl.'s Ex. 15.

Morse also combated mounting concerns over her job performance. In July 2009, Lanum gave Morse twenty-four hours to prepare a briefing document for an upcoming meeting with the Agency director. But Morse balked, claiming the project was "not her responsibility"—

4

especially since the deadline coincided with her previously scheduled vacation time. Though Morse and the government disagree over whether another superior agreed to reassign the project or whether Morse just refused to complete it, the record reflects Lanum interpreted her inaction as insubordination and began imposing shorter and more frequent deadlines on her work. Pl.'s Ex. 2 at 86:8–90:11, 91:1–92:13; Pl.'s Ex. 6 at 20:20–21:3; Gov't's Ex. 2 at 57:6–60:22, 205:9-21, 209:2-22, 396:8–399:16; Gov't's Ex. 3 at 41, 51, 139-41. A few weeks later, continued conflict between Morse and Cross again required Lanum's intervention; Morse was not complying with the mediated information sharing protocol, blaming Cross's frequent unavailability. Pl.'s Ex. 2 at 115:20–119:14; Pl.'s Ex. 6 at 53:12–56:17; Pl.'s Ex. 10 at 406:8-15; Gov't's Ex. 1 at 484:12–490:1; Gov't's Ex. 3 at 422.

The very next day, Morse requested time-off under the Family and Medical Leave Act, 29 U.S.C. § 2601 (FMLA) from September 1, 2009 to October 5, 2009 to undergo hip replacement surgery. Pl.'s Ex. 2 at 120:9–121:1; Gov't's Ex. 2 at 440:1-10, 507:1-22; Gov't's Ex. 3 at 697-99; *see also* Pl.'s Ex. 17. At the same time, she was also nearing the end of her two-year probationary period, which expired October 1. Gov't's Ex. 3 at 786. And whenever employees reach the end of their probationary period, their supervisor must prepare a memo recommending either their permanent hire or their termination.

Lanum promptly approved Morse's FMLA request. Pl.'s Ex. 2 at 120:17–121:1. But a week later, in the required end-of-probation memo, he recommended terminating Morse effective October 1. Pl.'s Ex. 18. He based his recommendation on Morse's failure to work collaboratively, Morse's failure to take direction from superiors, Morse's performance deficiencies, and Morse's failure to improve despite repeated attempts to help her. *Id.* Scott concurred with this judgment. Gov't's Ex. 3 at 1016b.

5

So on Thursday, August 27, 2009—three business days before her FMLA leave began—Lanum and a human resources representative told Morse that she would be terminated the following Monday (August 31) and that her FMLA leave would be cancelled. Pl.'s Ex. 2 at 121:3-16; Gov't's Ex. 1 at 633:6–635:10; Gov't's Ex. 3 at 1015. This surprised and concerned Morse. It surprised her because she knew at least one male employee failed to complete an assignment and wasn't terminated. Pl.'s Ex. 19 at 9. And it concerned her because it meant her health insurance might lapse before her surgery. So she wrote to the Agency's director, his deputy, and his chief of staff. Gov't's Ex. 3 at 1016d. Later that day, the Agency changed course and put Morse on indefinite administrative leave to ensure her continued health insurance coverage. Pl.'s Ex. 20. During this period Lanum completed Morse's final performance evaluation. *See* Pl.'s Ex. 21. And after almost a month of administrative leave, the Agency contacted Morse on September 22 with the news her final termination would occur three days later on September 25. Gov't's Ex. 1 at 633:6–635:10; Gov't's Ex. 3 at 1015.

## II

Morse now sues the government under Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e–2000e-17, and the Rehabilitation Act, 29 U.S.C. §§ 701–797, alleging the Agency unlawfully discriminated against her because of her gender, race, color, or physical disability and seeking damages for lost wages, lost benefits, pain and suffering, mental anguish, and emotional distress, as well as attorneys' fees, costs, and interest. The government moves for summary judgment, arguing Morse fails to establish a prima facie case of gender, race, or color discrimination and to state a valid Rehabilitation Act claim.

# A

As a threshold matter, Morse spends five pages urging the Court to strike the government's summary judgment motion and its earlier related motion for a one-business-day extension, ECF No. 31 (which the Court granted nunc pro tunc, *see* ECF No. 33), because the government filed the motion to extend after 8:00 PM on the original due-date and since the government did not provide good cause justifying this "absurd" and "inexcusable" delay. Pl.'s Mot. 5, ECF No. 34. To support her contention that extension motions filed after 8:00 PM on the due date are improper, Morse cites an unpublished opinion by a magistrate judge striking an extension motion filed at 8:29 PM on the due date, because it was "impossible for [the magistrate] to have acted on the motion [in time] since [he] had already left for the day when it was filed." *Fudali v. Pivotal Corp.*, No. 03-1460, 2011 WL 122053, at *1 (D.D.C. Jan. 14, 2011). The magistrate further explained his "calendar reflects that [he] had a dinner engagement that evening, and [he] recall[s] leaving [his] chambers at about 6:15 p.m." *Id.* at n.2.

But this Court will not be so snitty, both because conditioning timeliness on a judges' personal calendar is untenable, and—more importantly—because any delay did not prejudice Morse. *See Yesudian ex rel. United States v. Howard Univ.*, 270 F.3d 969, 971 (D.C. Cir. 2001) (holding district courts can grant even after-the-fact deadline extensions without finding excusable neglect if the other party was not prejudiced). To the extent Morse feels shortchanged since the government's one-business-day extension left her only "27 days" under the original schedule "to complete her motion," Pl.'s Mot. 5, the Court reminds her that she could have moved for an extension, too.

Since the government moved for an extension and the Court granted it nunc pro tunc, its summary judgment motion was timely, and is now properly before the Court.

B

Next, Morse's discrimination claim alleging disparate treatment because of her race, color, and gender. To prove disparate treatment, Morse must show a protected characteristic caused an adverse employment action against her. *See Baloch v. Kempthorne*, 50 F.3d 1191, 1196 (D.C. Cir. 2008). Of course, Title VII protects race, color, and gender, *see* § 703(a)(1), and at least Morse's termination constitutes an adverse employment action, *see Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003).[1] And absent direct evidence of causation, a plaintiff can prove disparate treatment circumstantially through the famous burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Stella v. Mineta*, 284 F.3d 135, 144-45 (D.C. Cir. 2002). First, a plaintiff must establish her prima facie case: that she belonged to a protected class; that she was otherwise qualified for her job; and that she suffered an adverse action giving rise to an inference of discrimination. *Id.* Once she makes that prima facie showing, the burden shifts to her employer to articulate a nondiscriminatory reason for the adverse action. *Id.* And if the employer does, the burden shifts back to the plaintiff to show the reason was pretextual, and the actual justification was discriminatory. *Id.*

---

[1] But the Court doubts Morse's other claimed discriminatory acts amount to adverse actions. Most of them—Morrow preventing Pizarro Hyman from maybe giving Morse a two-point-bump on a thirty-point performance evaluation; Morrow sharing confidential information with Ramdass to help him try for a promotion he ultimately failed to obtain; Scott merely considering reassigning Morse; and Lanum not immediately granting Morse's request for a flexible work schedule—are insufficiently "tangible" or "significant" employment status modifications. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). And the record either fails to show or discredits Morse's others, including that Lanum only counseled Morse after she and Ramdass clashed over a missing weekly report, that Lanum did not counsel other male employees who refused to complete assigned tasks, or that the Agency canceled Morse's FMLA leave. *See generally Kreuzer v. Am. Acad. Of Periodontology*, 735 F.2d 1479, 1495 (D.C. Cir. 1984) (collecting cases holding a nonmovant may not defeat a summary judgment motion by resting on the complaint). But even if these allegations do constitute adverse actions, the government would still obtain summary judgment because, as explained *infra*, the government provides legitimate nondiscriminatory reasons for them, *see* Gov't's Mem. 13-33, and Morse lacks evidence demonstrating those reasons are pretextual.

But at the summary judgment stage, if the employer "proffer[s] a legitimate, non-retaliatory reason for a challenged employment action," the *McDonnell Douglas* three-step collapses into one: "[T]he central question is whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason and that the employer intentionally retaliated against the employee in violation of Title VII." *McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012).

Here, Morse cannot clear that single hurdle. Even if she can circumstantially prove a prima facie disparate treatment case, she must still overcome the government's explanation that it terminated Morse because of her repeated misconduct and failure to follow direction. That requires evidence showing "better treatment of similarly situated employees outside [her] protected group, [the government's] inconsistent or dishonest explanations, its deviation from established procedures or criteria, [its] pattern of poor treatment of other employees in the same protected group as [her], or other relevant evidence that a jury could reasonable conclude evinces an illicit motive." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016).

She does not have any. For one, although she tries pointing to similarly situated employees outside her protected group who she claims the Agency treated more favorably, *see* Pl.'s Mem. 9-13, ECF No. 34, no purported comparators engaged in misconduct of similar degree and duration. And though she plucks two statements from the record she claims contradict the government's asserted justification—Lanum's testimony that, setting aside Morse's professional issues, her work product was "really good" and "topnotch," *see* Pl.'s Ex. 6 at 28:20–32:9; and Morse's final performance evaluation (submitted days before her termination) which recommended "sustain[ing her] current assignment"—neither unravels the government's explanation.

9

Take Lanum's admiring characterization of Morse's work product. The government never suggested it fired Morse because her work wasn't good enough. Rather, the government consistently said it fired Morse because she refused to work collaboratively in the Agency's professional and hierarchical environment. *See* Gov't's Mem. 31-33, ECF No. 32. The relevant portion of Lanum's testimony bears that out, describing Lanum struggling to reconcile her "really good work" with her "trouble for not getting to work on time." *See* Pl.'s Ex. 6 at 28:30–32:9. Properly contextualized, Lanum's statement does not contradict the government's asserted justification.

So too for Morse's final performance evaluation. True enough, when presented with a dichotomy between either "sustain[ing her] current assignment" or expanding her responsibilities, the reviewer checked the former box. Pl.'s Ex. 21 at 416. But as the rest of the report shows, that does not mean Morse was a model employee:

- it describes her as only "[m]inimally [s]uccessful" in contributing to the Agency's mission, *id.* at 413-14;
- it notes she "did not complete" various tasks and "[o]cassionally failed to uph[o]ld values of [the] office in dealing with external customers," *id.* at 413-14, 416;
- it blames "[h]er inability to complete duties" for "continued confusion" that "le[ft the Agency] unable" to advance its goals, *id.* at 413, 416;
- it concludes her "failure to commit to teamwork . . . and failure to convey high professional and ethical standards has led to her being in constant and continuous conflict with those performing supervisory or administrative oversight duties," *id.* at 413;
- it documents "[s]he has not effectively properly responded to repeated counseling," *id.* at 413;

10

- it notes "when it comes to her relationship with her peers and those in positions of authority, Ms. Morse has exhibited a reluctance to accept both developmental and motivational feedback," *id.* at 416; and

- it recalls Morse "[d]id not regularly display behavior reflective of team work and cooperation" or "professionalism and ethical duty," *id.* at 413.

Indeed, the report further reconciles Lanum's positive characterization of Morse's work product with the government's asserted justification for firing her:

> Her work . . . reflect[s] an ability to plan, think critically and produce quality work, yet Ms. Morse struggles in the area of accountability regularly failing to identify her role in conflict or to accept feedback regarding her own errors. Her written documents frequently require[] multiple revisions. She also has experienced difficulties in understanding the priorities of [her superiors] and aligning those objectives to the day-to-day work. Her inability to effectively engage with other members of the . . . Office has necessitated inordinate attention and concern by all members of the . . . leadership team and on one occasion let to the office's failure to properly brief the DIA director.

*Id.* at 415.

In sum, Morse's purported comparators, Lanum's deposition testimony, and Morse's final performance evaluation do not provide reasonable evidence of pretext to overcome the government's nondiscriminatory explanation for her termination. And so even if Morse can prove a prima facie disparate treatment case, her Title VII claim cannot survive summary judgment.

C

Morse's Rehabilitation Act claim falls for the same reason. Though the Rehabilitation Act imposes a heightened causation standard—plaintiffs must prove their disability was the but-for cause of the adverse action—plaintiffs can still circumstantially prove their case through the

11

*McDonnell Douglas* framework. *See Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993). And, just like in the Title VII context, once a defendant offers a legitimate justification for the adverse action, the plaintiff must marshal evidence casting doubt on that reason to survive summary judgment. *See Baloch*, 550 F.3d at 1197-98.

Morse again fails to do so. Besides rehashing the arguments from her Title VII claim, she theorizes her physical impairment was the but-for cause of her termination since the government did not fire Morse immediately after her misconduct, but fired her instead a few weeks later once her impairment necessitated FMLA leave. But that theory elides a pertinent detail: Morse's termination coincided with the conclusion of her two-year probationary service period, which happened to overlap with her requested leave. Indeed, as the government explains, the decision to permanently hire or fire "must be made about every probationary employee" at the end of their two-year cycle "regardless of [their] race, sex, age, color, or perceived disability." *See* Gov't's Mem. 31 (citing Gov't's Ex. 3 at 1015). In other words, whether or not she took FMLA leave, the Agency would still have been faced with the question to hire or fire her. And likewise, the Agency's answer would have been the same whether or not she took FMLA leave. Simply put, the Agency says it fired her not because her disability necessitated FMLA leave, but rather because her repeated misconduct and failure to follow directions. Morse does not even acknowledge this point, let alone providing evidence disproving it.

So since Morse lacks evidence of pretext undermining the government's proffered reason for terminating her, her Rehabilitation Act claim fails too.

## III

In the end, because Morse cannot overcome the government's legitimate, nondiscriminatory justification for firing her, her claims cannot survive summary judgment. So the Court will grant the government motion. A separate order follows.

May 16, 2019

_____
Royce C. Lamberth
United States District Judge